UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. THOMAS RUNYAN, M.D., <br><br> Plaintiffs, <br><br> v. <br><br> SURGERY PARTNERS, INC., CONSULTANTS IN PAIN MEDICINE, LLC, COASTAL PAIN CENTER, LLC, KEVIN D. COYLE, M.D., LOGAN LABORATORIES, LLC, <br><br> Defendants. | Civil Action No. _____ <br><br><br> **FILED UNDER SEAL** <br><br> DO NOT PLACE ON PACER |

## COMPLAINT

Plaintiff-Relator, Thomas Runyan, M.D. ("Runyan") brings this *qui tam* action for himself and on behalf of the United States of America against Surgery Partners, Inc., Consultants in Pain Medicine, LLC, Coastal Pain Center, LLC, Kevin D. Coyle, M.D., and Logan Laboratories, LLC (collectively, the "Defendants") to recover damages and penalties resulting from the Defendants' actions in violating the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA").

### JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought under the FCA.

1

2. This Court has personal jurisdiction over all of the Defendants pursuant to 31 U.S.C. § 3732(a). Defendants can be found in, reside in, or transact business in the Southern District of Georgia.

3. Relator is aware of no jurisdictional bar to this action. To the extent there has been any public disclosure, Relator constitutes an "original source" pursuant to 31 U.S.C. § 3730(e)(4).

4. Relator voluntarily provided the information underlying the allegations contained in this Complaint to the United States on June 13, 2017, during an in-person meeting with representatives of the United States Department of Health and Human Services, Office of Inspector General and the Department of Justice.

5. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), because the Defendants can be found in, reside in, or transact business in the Southern District of Georgia, and many of the acts forming the basis of this action occurred within this District.

## PARTIES

6. The United States of America is the real plaintiff in interest in this action. The Medicare program, a federal health insurance program described in more detail *infra*, is administered by the Centers for Medicare & Medicaid Services ("CMS") which is an agency within the United States Department of Health & Human Services ("HHS").

7. Defendant Surgery Partners, Inc. ("Surgery Partners") is a Delaware corporation that is headquartered in Nashville, Tennessee. Surgery Partners owns and operates a national network of surgical facilities and affiliated ancillary service providers.

8. Defendant Consultants in Pain Medicine, LLC ("CIPM") is a physician practice located in Brunswick, Georgia. CIPM has maintained practice locations in Waycross, Richmond Hill, Vidalia, Dublin, and Saint Mary's, Georgia. CIPM is owned by Defendant Surgery Partners.

9. Defendant Coastal Pain Center, LLC ("CPC") operates outpatient surgery centers in Brunswick and Vidalia, Georgia. CPC is owned by Defendant Surgery Partners.

10. Defendant Kevin D. Coyle, M.D., ("Coyle") is a pain medicine physician licensed in the State of Georgia, and upon information and belief, is a part owner of CIPM and CPC.

11. Defendant Logan Laboratories, LLC ("Logan Labs") is a toxicology laboratory headquartered in Tampa, Florida, and is owned and operated by Surgery Partners.

12. Relator, Thomas Runyan, M.D., is a resident of the State of Georgia and was employed as a physician at CIPM and CPC until on or about January 25, 2017.

## THE FALSE CLAIMS ACT

13. The FCA provides, in pertinent part, that any person that: (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or (2) knowingly makes, uses, or causes to made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States for damages and penalties. 31 U.S.C §§ 3729(a)(1)(A)-(B).

14. The term "knowingly" under the FCA means a person, with respect to information, (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required to show a person acted knowingly under the FCA. *Id.*

3

15. Violations of the FCA subject the defendant to civil penalties of not less than $5,500 and not more than $11,000 per false claim plus three times the amount of damages that the Government sustains as a result of the defendants' actions. 31 U.S.C. § 3729(a).

## APPLICABLE FEDERAL HEALTHCARE PROGRAMS AND LAWS

### The Medicare Program

16. In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395ccc, known as the Medicare Program. The Medicare Program is administered and funded through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

17. Medicare is a federally subsidized health insurance system for persons over the age of sixty-five, the disabled, and those afflicted with end-stage renal disease.

18. Part A of the Medicare Program, 42 U.S.C. §§ 1395c-1395i-2, provides payments for basic hospitalization insurance costs. Part B of Medicare, 42 U.S.C. §§ 1395j-1395ww, provides payments for physician services and certain medical and other health services.

19. For outpatient treatment and services, such as those provided in a physician's office or at a laboratory, Medicare reimbursement is subject to Part B. 42 U.S.C. §§ 1395j-1395w-4.

### Medicare Billing for Physician Services

20. Medicare enters into provider agreements with physician groups to establish the group's eligibility to participate in the Medicare program, including receiving Medicare reimbursement under Part B.

21. Physicians receive Part B payment for their professional services performed in their offices. When services are rendered in an independent physician's office, Medicare reimburses the billing entity through a single payment based on a physician fee schedule.

22. To obtain Medicare reimbursement under Part B, providers submit claims using forms known as CMS 1500s. Among the information the provider includes on a CMS 1500 form are certain five-digit codes, known as Common Procedural Codes, or CPT codes, that identify the services rendered for which reimbursement is sought.

23. Medicare sometimes permits physicians to bill for services provided by a non-physician practitioner such as a physician assistant ("PA") or a nurse practitioner ("NP") under the physician's provider number rather than the non-physician practitioner's number. CMS 100-02, Chapter 15, § 60. This allows the physician's office to receive reimbursement in the amount of 100% of the physician fee schedule allowable amount, whereas non-physician practitioners are and generally reimbursed at 85% of the physician fee schedule. CMS 100-04, Chapter 12, § 120.

24. The use of a physician's provider number to bill for non-physician services is referred to as "incident to" billing because the non-physician practitioner's services are rendered "incident to" the physician's services.

25. Billing "incident to" requires that the services provided to the patient be supervised by the physician.

26. Under Medicare, the requisite level of physician supervision under incident-to billing is called "direct supervision."

27. Direct supervision means the physician is physically in the office suite during the patient's visit and immediately available to furnish assistance to the mid-level, if needed.

28. If the strict requirements of "incident to" billing are not met, a non-physician practitioner may still bill for services provided within his/her scope of practice but must do so under his/her own provider number. CMS 100-02, Chapter 15, § 60.2. This means that reimbursement from Medicare will be at a reduced rate or 85% of the physician fee schedule.

### Medicare Services Must Be Reasonable and Necessary

29. Medicare will only pay for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395(a)(1)(A).

### Medicare Certification

30. A provider seeking Medicare reimbursement through Part B must certify through the CMS 1500 that the services were, *inter alia*, appropriate, medically indicated, and necessary for the health of the patient, and personally furnished by the provider or were supervised by the provider.

31. Specifically, the CMS 1500 certification states: "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision."

### Medicare Billing for Urine Drug Testing

32. Presumptive (*i.e.*, initial) urine drug testing to verify compliance with treatment, identify undisclosed drug use or abuse, or evaluate aberrant behavior is considered medically necessary up to 24 times per year, beginning at the start of treatment, as part of a routine monitoring program for individuals who are: (1) Receiving treatment for chronic pain with prescription opioid or other potentially abused medications; or (2) Undergoing treatment for, or monitoring for relapse of, opioid addiction or substance use disorder.

33. Presumptive (*i.e.*, initial) urine drug testing is also considered medically necessary for the following: (1) to assess an individual when clinical evaluation suggests use of non-prescribed medications or illegal substances; or (2) on initial entrance into a pain management program or substance use disorder recovery program.

34. Definitive urine drug testing is considered medically necessary when all of the following criteria are met: (a) the presumptive urine drug testing was done for a medically necessary reason; (b) the presumptive test was negative for prescribed medications, positive for a prescription drug with abuse potential which was not prescribed, or positive for an illegal drug (for example, but not limited to methamphetamine or cocaine), and (c) the specific definitive test(s) ordered are supported by documentation specifying the rationale for each quantitative test ordered and clinical documentation reflects how the results of the test(s) will be used to guide clinical care.

35. The use of presumptive or definitive testing panels is considered not medically necessary unless all components of the panel have been determined to be medically necessary based on the criteria above.

## DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

### A. Lack of Supervision of Mid-Levels When Billed as Physicians

36. At all times relevant to this action, as detailed below, the Defendants knowingly submitted false claims to Medicare by requesting reimbursement for incident-to services that were not properly supervised by Dr. Coyle.

37. CIPM maintained six (6) different office locations where patients would be seen for pain management treatment. Dr. Coyle saw patients in the office at the Brunswick, Waycross, and Vidalia locations.

7

38. Coyle performed surgical procedures (i.e., injections) at CPC, the ambulatory surgical centers in Brunswick and Vidalia.

39. As a matter of routine, Dr. Coyle's mid-level providers, either a PA or NP, would see a patient in one of the CIPM offices; however, Dr. Coyle would not be in the office or immediately available to provide the requisite level of supervision for that patient office visit.

40. Dr. Coyle and CIPM maintained a detailed electronic schedule of Dr. Coyle's patient appointments, surgical procedures, and off-days, including vacation days. The schedule details Dr. Coyle's specific whereabouts on a given day.

41. Knowing that the requisite level of supervision would not be provided, Dr. Coyle authorized PA's and NP's to bill incident-to and under the physician fee schedule.

42. This allowed Coyle and CIPM to receive Medicare reimbursement in the amount of 100% of the physician fee schedule amount rather than the reduced 85% of the physician fee schedule.

43. As a matter to routine, and as further evidence of his scheme to receive reimbursement to which he is not entitled, Dr. Coyle electronically signed the patient medical chart several days after the patient was allegedly seen by the mid-level, in violation of Medicare signature requirements.

44. Upon information and belief, numerous Medicare claims have been submitted by Dr. Coyle and CIPM as incident-to services from either the CIPM Waycross office or the CIPM Vidalia office on the same day that Dr. Coyle is performing procedures at the CPC location in Brunswick or seeing patients at the CIPM office in Brunswick.

45. The recorded distance between Brunswick and Waycross is approximately 60 miles. The recorded distance between Brunswick and Vidalia is approximately 103 miles.

46. Other specific examples of false claims being submitted are as follows:

| Patient Initials | Date of Service |
|---|---|
| S.D. | 01/20/2016 |
| M.R. | 04/04/2016 |
| S.J. | 02/12/2016 |
| T.J. | 04/01/2016 |
| Z.H. | 08/31/2016 |
| B.W. | 2/15/2016 |
| W.S. | 08/29/2016 |
| H.C. | 08/30/2016 |

47. Furthermore, as a matter of routine, on days that Dr. Coyle was either absent from the office (*i.e.*, not working) or on vacation, Coyle authorized incident-to billing by mid-levels despite physician supervision being an impossibility.

48. A particularly egregious example of Coyle's fraudulent conduct was when he certified on Medicare claims that he supervised his mid-level providers and authorized incident-to billing for services that were allegedly provided at CIPM when he was on vacation in Dublin, Ireland and attended a Georgia Tech football game on September 3, 2016.

B. **Medically Unnecessary Urine Drug Testing**

49. CIPM and CPC treat a lot of patients suffering from pain symptoms.

50. Pain, among other things, can be treated medically through prescription drugs. A known side-effect of prescription drugs is addiction whereby treating physicians must address

9

the risks of addiction through monitoring of patient drug tendencies through testing, such as urine drug testing.

51. When appropriate, urine drug testing can be utilized to detect the presence of illicit drugs or non-prescribed controlled substances, or to monitor the patient's compliance of drug treatment.

52. As a matter of routine, Dr. Coyle knowingly orders urine drug testing for patients that are not medically necessary.

53. The testing sample is shipped out and the testing is performed by Logan Laboratories which is owned and operated by Defendant Surgery Partners.

54. This scheme is evidenced by the "standing order" form that Logan Laboratories asked Relator to sign (which he refused to do) which purportedly authorizes the unnecessary testing.

55. Upon information and belief, Dr Coyle signed the standing order to authorize urine drug testing regardless of whether the test was medically indicated. Specifically, the standing order authorized Logan Laboratories "to perform testing as indicated on any Logan Laboratories requisitions received from [Coyle's practice] that do not include a signature from either [Coyle] or [Coyle's] staff."

56. Dr. Coyle and CIPM conduct an initial drug screen in their office, but routinely send the samples out for confirmatory testing regardless of screening results and oftentimes, even before the screening results are obtained.

57. The drug testing as well as reimbursement is based on the stratification for level of risk. A higher level test is ordered if there is an increased chance of dependency or drug usage.

However, lower testing is appropriate when there are little-to-no indicators of dependency or abuse.

58.  Dr. Coyle orders confirmatory testing that exceeds the recommended risk level given the patient's presentation and that is not supported by documentation in the medical record.

59.  Dr. Coyle's motivation in ordering excessive confirmatory urine drug testing is not the best interest of the patient but financial gain for himself.

60.  Specific examples of unnecessary ordering of urine drug testing are as follows –

| Patient Initials | Dates of Service |
|---|---|
| J.R. | 03/03/2015 – 09/20/2016 |
| B.W. | 02/15/2016 – 08/08/2016 |
| D.S. | 08/31/2016 |
| R.R. | 10/21/2015 – 07/06/2016 |
| G.C. | 12/16/2015 – 10/05/2016 |

61.  These claims for urine drug testing are not reasonable and necessary.

62.  This unnecessary testing results in the Logan Laboratories receiving improper, unjustified, and extraordinarily high payments from Medicare.

C.  **Additional Medicare-Related Fraudulent Practices**

63.  Because of the extent of improper billing and other misconduct, it is believed that similar and/or substantial additional fraudulent practices by the Defendants (such as upcoding, inadequate documentation, Stark Law and Anti-Kickback Statute violations), not specifically

mentioned in this Complaint, are likely to surface as a result of the instant action and information provided by the Relator to the Government.

## COUNTS

### Count One: False Claims (31 U.S.C. § 3729(a)(1)(A))

64. Relator re-alleges and incorporates by reference each allegation in each of the preceding paragraphs as though fully set forth herein.

65. Through the acts described above, the Defendants knowingly submitted and/or knowingly caused its agents and employees to submit false claims for payment to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

66. The United States of America, unaware of the falsity of the claims, paid monies to the Defendants to which they were not entitled.

67. By virtue of the false claims that Defendants submitted or caused to be submitted, the United States has suffered actual damages in a substantial amount to be determined at trial.

### Count Two: False Statements (31 U.S.C. § 3729(a)(1)(B))

68. Relator re-alleges and incorporates by reference each allegation in each of the preceding paragraphs as though fully set forth herein.

69. Through the acts described above, the Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get a false or fraudulent claim paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

70. The United States of America, unaware of the falsity of the records, statements, and claims made or caused to be made by the Defendants, paid monies to the Defendants to which they were not entitled.

71. As a result of the Defendants' acts, the United States has suffered actual damages in a substantial amount to be determined at trial.

## PRAYER FOR RELIEF

72. WHEREFORE, the Relator, on behalf of the United States, demands and prays:

73. That the Court enter judgment against Defendants in an amount equal to three times the loss sustained by the United States, plus a civil penalty of between $5,500 and $11,000 for each and every false claim that Defendants presented or caused to be presented for payment;

74. That the Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees;

75. That the Relator be awarded the maximum amount allowed pursuant to the FCA; and

76. That the Court orders such other relief as it deems just and proper.

## REQUEST FOR JURY TRIAL

77. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator requests a jury trial.

Respectfully Submitted,

MORRIS, MANNING & MARTIN, LLP

/s/ Edgar Bueno

Edgar D. Bueno
Georgia Bar No. 363916
24 Drayton Street
Savannah, GA 31401
Tel: (912) 232-7182
Fax: (912) 232-7184
ebueno@mmmlaw.com

*Attorney for Plaintiff-Relator*